UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

_____ )
                                  )
UNITED STATES OF AMERICA          )
                                  )
V.                                )   CR. NO. 12-CR-00149-JL
                                  )
DAVID KWIATKOWSKI                 )
                                  )
_____ )

## DEFENDANT'S SENTENCING MEMORANDUM

David Kwiatkowski pled guilty to seven counts of Tampering With a Consumer

Product in violation of 18 U.S.C. § 1365(a) and seven related counts of Fraudulently

Obtaining Controlled Substances in violation of 21 U.S.C. §§ 843(a)(3) and 843(d).  After

acceptance of responsibility, the total offense level is 41. *PSR ¶109.* Applying a CHC of I

yields an advisory guideline sentencing range of 324 - 405 months. *PSR ¶ 132.* This

guideline calculation includes significant enhancements based upon the specific

circumstances of the case. The base offense level for one of the offenses was increased to

38 because one of the victims died. *PSR ¶ 90.*  There were also enhancements because

Kwiatkowski abused his position of trust and because the victims were uniquely

vulnerable. *See PSR ¶¶92 and 93.*  He is scheduled to be sentenced on December 2, 2013.

The parties have reached a binding agreement pursuant to Fed.R.Crim.P.

11(c)(1)(C) that the defendant be sentenced to a period of incarceration of at least 30

years (360 months) but no more than 40 years (480 months).  The 360 month sentence

requested by Kwiatkowski is three years above the low end of the guideline range.  The

480 month sentence requested by the government is six years above the high end of the

guideline range.

### A. Consideration of the victims

Kwiatkowski's reckless conduct has forced vulnerable, unsuspecting, and innocent

people to endure immeasurable suffering and anguish.  He recognizes that the Court's

sentencing analysis should be driven by the life shattering nature of the injuries suffered

by the victims and their families.  A number of the victim's and their family members

have submitted letters to the Court.  Kwiatkowski must face the reality of the harm that he

has caused these people.  He has therefore included reference to the concerns raised in

their submissions to the Court.[1]

Victim 1 is a 52 year old professional, who describes herself as a mother,

grandmother, daughter, sister, and friend. She describes herself as, in a sense, fortunate

because she is strong enough to undergo treatment, and with that comes the hope that she

may become cured. As it stands, however, her life has been devastated.  She is no longer

able to perform her job up to her traditional standards because of extreme fatigue.  She

describes not being able to hold and console her 1/1/2 year old grandson when he fell

recently because she had received a small cut and was afraid to touch him.  She has also

---

1. Counsel has not included any reference to any information which might serve to
identify these victims.

been unable to visit family members out of fear they may become infected. She is troubled by the uncertainty of her future medical situation.

Victim 2 and his wife both wrote letters to the Court. Victim 2 describes discovering that he had contracted Hepatitis C after a procedure at Exeter Hospital. He almost died as a result of a reaction to the treatment.  He describes it as the worst thing that has ever happened in his life. He began a second phase of treatment which also had to be stopped because of complications.  His medical problems have essentially ruined his career and unhinged his planned retirement.  His wife's statement mirrors his.  She adds that he has been unable to control his diabetes, has developed Reynaud's syndrome, suffers from depression, severe fatigue, and weight loss.  He used to travel for business 180 days a year, but now he can hardly make it to the office.

Victim 3 describes that she was unable to return to work for months after her procedure because of fatigue, nausea, weakness, and stomach pains caused by her infection.  Her diabetes and autoimmune disease combined with the Hepatitis C have destroyed her ability to function, yet she has no choice but to attempt to continue working. Her son wrote a letter for Victim 3..  He describes that while being treated for her third heart attack she was infected by Kwiatkowski. Because of damage to her liver she has been forced to stop taking the cholesterol medication that protects her from additional heart problems. She has no choice but to continue working to support herself, however, she is often so extremely fatigued and nauseous that this is almost impossible.  She has

been forced to frequently call in sick and is danger of losing her job.

Victim 4 is an 84 year old man who always thought himself a very lucky man, until now. All he can do now is hope that his luck holds out.

Victim 5 describes loss of money, pain, anxiety, memory loss, and loss of ambition. He describes that he is fearful of being around loved ones. He endured an emotional meltdown when his son and daughter-in-law came to visit and he could not even hold his five year old grandson.  Because of his condition, he is not a candidate for treatment.

Victim 6 is referred to in the initial victim letter that was submitted to probation and is included as part of the PSR. He describes problems with his treatment because of his other ongoing medical problems.  He has been forced to consult a therapist because he has become distant, angry, and obsessed with talking about death.  He describes that this has been the worst time in his entire life and that is has been very hard on family members.

These letters are the only ones that Kwiatkowski has been provided with to date. There are obviously numerous other victims who have suffered, and who will continue to suffer similar heartache and pain.  All of this was caused by Kwiatkowski.  It is not surprising that all of these people are requesting that he be sentenced to the longest sentence permitted by the plea agreement.  The Court will consider and give great weight to these letters, to any future letters by other victims, and to the sentences they seek.  The

Court, however, should also consider sentences which other courts have imposed in similar cases.

### B. United States v. Steven Beumel

Steven Beumel was a Special Procedures Technologist for the Department of Radiology at the Mayo Clinic in Jacksonville Florida. On May 19, 2011 a grand jury in the United States District Court for the Middle District of Florida, Jacksonville Division handed down an indictment charging him with five counts of Tampering With a Consumer Product in violation of 18 U.S.C. § 1365(a) and five related counts of Fraudulently Obtaining Controlled Substances in violation of 21 U.S.C. §§ 843(a)(3). The conduct occurred between October 2004 and August 2010, a period of 6 years. *Exhibit A, Indictment.* Essentially Beumel did the same thing as the defendant. He was infected with Hepatitis C, he diverted fentanyl while involved in invasive medical procedures, and he thereby infected multiple patients. A transcript of the sentencing hearing in that case has been attached as *Exhibit B.*

Initially the prosecutor described the suffering of the victims to the Court. As in the instant case, one of the victims in that case died as a partial result of Buemel's conduct. That patient had received a successful liver transplant. He was infected with the Hepatitis C virus during a routine follow up procedure in which Beumel diverted fentanyl. *Exhibit B p. 94.* His entire family was simply crushed. A second victim was infected before he had the opportunity to get a liver transplant. He eventually did get a

transplant, but died shortly thereafter when his cancer returned.. *Exhibit B p. 97-98*.

Beumel's next victim suffered from Multiple Myeloma. He was at the Mayo Clinic to

have his immune system suppressed so that he could receive treatment for the disease

when Buemel infected him with Hepatitis C. This seriously complicated his ability to get

treatment for the Hepatitis C. *Exhibit B p. 99*.

   The most heart wrenching evidence, however, comes from the victims themselves,

through the submission of letters and live testimony. That evidence begins on page 124

of the sentencing transcript and continues through page 172. *Exhibit B p. 124 - 172*. Even

reading these transcripts is extremely difficult. It is not possible to do so without

becoming emotional. To have to actually live through what these victims are describing

would be unbearable.

   When the nature and scope of the infection was discovered, staff at the Mayo

Clinic were tested for Hepatitis C. Beumel initially refused to undergo the testing.

*Exhibit B p. 100*. When he finally submitted to the test, he was discovered as the source

of the infection. He initially denied that he had taken any fentanyl, and denied knowing

how the patients became infected.. At some point he finally admitted his involvement.

*Exhibit B p. 101*. Because of Beumel's conduct 3,455 patients were tested for Hepatitis

C. *Exhibit B p. 102*.

   The prosecutor pointed out that Beumel had previously been caught doing the very

same thing in 2004 while employed at a different hospital. He was suspended for a week

while he was treated at an outpatient drug abuse program.  The program included counseling concerning the dangers of Hepatitis C.  *Exhibit B p. 108-109.*  Beumel was allowed to keep his license as a radiology technologist because he entered a long term drug treatment program.  He signed a contract in 2004 agreeing to participate in a two year treatment program.  *Exhibit B p. 109.*  The drug testing required by the program could not detect fentanyl, however Beumel tested positive for marijuana on one occasion.  *Exhibit B p. 110.*  After the positive test he was permitted to remain in the program for an additional 2 years.  Beumel actually infected a number of the victims while he was in that treatment program. The Mayo Clinic was unaware of any of this because he had lied on his application when asked if he had a drug addiction problem.  *Exhibit B p. 110.*

Beumel pled guilty with no agreement as to what the sentence should be. *Exhibit B p. 120.*  Because he pled guilty at the last moment, the government had completely prepared the case for trial. *Exhibit B p. 124.*  At sentencing, the government argued for a sentence of 30 years, which was at the upper end of the guideline range. *Exhibit B p. 121.*

### C.  Beumel's sentence

The court imposed a sentence of 360 months.  The court considered it an aggravating factor that Beumel had been given treatment, and a chance to save his career, but that despite that fact he not only committed the offense but did so while he was receiving treatment. *Exhibit B p. 202.*  The court also found that Beumel was not being honest when he claimed that he was unaware that he had Hepititis C.  The court

specifically noted that even though Beumel might not have known "for sure" that he was

infected, he "had to know [he] was very likely the cause of other people's infections, and

he continued with his conduct. *Exhibit B p. 203*. The court was also concerned that,

through his statements, Beumel had implied that it was somehow the nurses' fault

because they left the syringes were they were available, and that one of the patients had

given him Hepatitis C. *Exhibit B p. 203-204.*

Beumel's sentence was upheld on appeal, *see* <u>United States v. Beumel</u>, 522 Fed.

Appx. 623, 2013 U.S. App. LEXIS 12760 (11th Cir. 2013)(*Cert. Denied* <u>Beumel v. United</u>

<u>States</u> 2013 LEXIS 7284 (U.S. Oct. 15, 2013)

### D.  <u>United States v. Kristen Parker</u>

Kristen Parker was initially charged in a 42 count indictment on July 23, 2009.

That indictment was superceded on August 27, 2009 with an indictment alleging 38

counts, which included 19 violations of 18 U.S.C. § 1365(a) and 19 associated violations

of 21 U.S.C. § 843(a)(3) and (d)(1). *Exhibit C.*  The two groups of 19 counts reflect that

there were 19 victims. Parker engaged in essentially the same conduct as Kwiatkowski.

She and the government entered into a plea agreement pursuant to Fed.R.Crim.P.

11(c)(1)(C) which provided for a sentence of 240 months. *Exhibit D.*  While employed at

the Rose Medical Center Parker stole fentanyl syringes that were laid out in anticipation

of surgical procedures, injected herself, and placed them back on the surgical cart after

filling them with saline solution. She did this about 15 - 20 times. *Exhibit D p. 5 - 6.*

She admitted to continuing the practice at the Audobon Surgical Center after she left

Rose Medical Center. As a result of her conduct 5900 patients had to be tested. At least

35 of those patients matched the genotype of hepatitis strain infecting Parker. The Court

rejected the proposed plea agreement. *Exhibit E.*

Parker subsequently pled guilty, and was sentenced on February 24, 2010. Once

again numerous victims shared their stories with the court. *Exhibit F p. 31 - 50.* As in

Beumel's case, they were unspeakably tragic.

The court found that the advisory guideline sentencing range was 235-293 months.

*Exhibit F p. 55.* The Court described Parker's conduct as heinous, egregious, and

loathsome, as well as incomprehensible and unconscionable. The Court noted:

> These terrible crimes with their ruinous consequences for so many are
> exacerbated by the nature of the drug, the number of innocent victims, the
> stealthful, selfish modus operandi of the defendant, and the lifelong
> unforgiving, irreparable injuries and the devastating physical and emotional
> consequences to victims and families.

*Exhibit F p. 57.* The judge found it incredulous that Parker continued to maintain that she

did not know that she had Hepatitis C. He specifically found that she knew or should

have known that she was infected, and that although she received credit for acceptance of

responsibility, she was not credibly or cogently contrite. *Exhibit F p. 59-60.* The Court

then sentenced Parker to 360 months, which was 67 months above the high end of the

guideline sentencing range. *Exhibit F p. 62.*

Parker's sentence was upheld on appeal. United States v. Parker, 413 Fed. Appx.

9

90, 2011 U.S. App. LEXIS 3306 (10th Cir. 2011)

### E.  Comparable cases support a thirty year sentence.

The Court should also consider that some defendants who have engaged in similar conduct as Kwaitkowski have received substantially lower sentences. In a case from the Western District of Texas, United States v. Jon Dale Jones, EP-08-CR-595-FM (WD El Paso 2009) the defendant received a sentence of only 41 months. The Judgment attached as *Exhibit G*.  The transcript of Jones' change of plea hearing is attached as *Exhibit H*. Jones was an anesthetist in the military who was infected with Hepatitis C. Because he was an anesthetist he had legitimate access to fentanyl.  He stole fentanyl from syringes, left the procedure room, injected himself, and returned with a syringe filled with saline solution.  He would subsequently list the missing fentanyl as wastage.  As a result of his conduct 16 patients were infected with hepatitis C. *Exhibit H p 25 - 29.* Jones was charged with violations of 18 U.S.C. §§7(3) and 113(a)(6) and 21 U.S.C. § 843(a)(3). For some reason he was not charged with violating 18 U.S.C. § 1365(a) .

At this point in time Parker and Beumel represent by far the most severe sentences ever imposed by any court for conduct like that in the instant case. They are important cases for this Court to consider because they are  factually similar to the instant case.  The most significant way that they are similar is that in each case victims have suffered unspeakable harm.  If anything, the victims in  Beumel's case present the most heartbreaking stories.  In reality, however, it is not possible to measure such anguish and

suffering, other than to say in each case it is extreme.  There are some ways, however, in which comparison can instructive.

Beumel refused to cooperate.  He took his case to the brink of trial. Thus the government had to fully prepare for prosecution.  Such preparation undoubtedly involved unnecessary intrusion into the lives of victims who were already living through a nightmare.  It also involved the expenditure of tremendous amounts of effort and resources by the government. Its is highly significant that Beumel had been given a second chance.  He had been permitted to keep his job as long as he underwent treatment. He was given another break when he tested positive for marijuana.  Most disturbing, he was in active treatment at the time he was injecting fentanyl at work and infecting his patients.  Finally, the court found that Beumel was dishonest when he claimed that he did not know that he was infected with Hepatitis C, and that in a sense, he was trying to blame his conduct on the nurses who had left the syringes available for him to steal. Parker was also found to be not credible in her claim that she was unaware that she was infected. The court also found her to be not credibly or cogently contrite.

As egregious as Kwiatkowski's conduct was, and it was egregious, he did not engage in any of the post arrest deception or brinkmanship as Beumel and Parker.  First, he indicated relatively early in the proceedings that he was going to accept responsibility and plead guilty. This obviously saved the victims from having to prepare for a trial. Moreover, his early plea not only saved scarce government resources in the District of

New Hampshire, but in all of the other districts involved in this case.  Finally, while

Kwiatkowski initially denied involvement in the offense, he confessed to the crime before

his first court appearance, when he admitted that he knew that he was infected with

Hepatitis C and did not try to blame anyone else for his conduct.

**F.  David Kwiatkowski's long-standing addictive disease underlies his offense conduct and mitigates his culpability for the damage and pain he caused some of his patients, none of whom he intended to harm.**

There can be no doubt that Kwiatkowski's chronic abuse of alcohol and narcotics

underlies his criminal conduct.  Now 34 years old, he  began abusing alcohol while

attending high school in Canton, Michigan.  *PSR ¶ 122.*  His alcohol use escalated at

Madonna University, where in 2002 he obtained a B. S. in Science.  *¶ ¶ 122, 124.*   A year

later he completed a Radiology Technology certificate program and became registered

with the American Registry of Radiological Technicians.  *PSR ¶ 124.*  He maintained

steady employment as a radiologic technician until last year, working on staff at several

hospitals, including at Exeter Hospital, and as a short-term "traveler" at numerous others.

*PSR ¶ ¶ 11,126-127.*  Tragically for himself and many others, until his arrest last year he

also drank regularly, approximately a fifth of vodka a day so as to feel "normal,  *PSR ¶*

*122.*  He was convicted of Operating while Impaired in 2005.  *PSR ¶ 112.*

Kwiatkowski's medical history is described in the Pre-sentence Investigation

Report.  *PSR ¶ 120.*  It includes Crohn's Disease, diagnosed in 1997 or 1998, and

Hepatitis C, diagnosed in 2010.  *Id..*  To treat his medical conditions, Kwiatkowski was

prescribed various prescription pain medications, including Demerol and Vicodin, *PSR ¶ 122*, which he began abusing while still in school. *PSR ¶ 11. See also Exhibit I p. KWI-00016* (Kwiatkowski admits to investigators that he began diverting controlled substances in 2002,when he and a co-worker took vials of morphine from an emergency room in Michigan.) He simultaneously abused alcohol and drugs, both lawfully prescribed and unlawfully diverted. *PSR ¶ 122.* As his tolerance increased, so did his drug and alcohol use. *Id.* He estimates that, in addition to vodka, by last year he was daily ingesting at least 80 milligrams of OxyContin when he could not obtain fentanyl, which he first used in 2003 and which he continued to use until he ceased working at Exeter Hospital. *Id.* He injected himself with 100 milligrams of fentanyl several times per week. *Id.*

Co-workers have described Kwiatkowski to investigators as a proficient Interventional Radiological (IR) technician but also noted that he seemed odd and that he was constantly sweating, even in surgical suites, which are typically kept cool. From discovery here is a portion of a redacted interview of a surgical technician who in 2008 worked with Kwiatkowski at University of Pittsburgh Medical Center Presbyterian (UPMC), where Kwiatkowski was implicated in the diversion of fentanyl and .

> Investigators asked Ms. [Nxxx] about the period of time that she worked with David KWIATKOWSKI. Ms. [Xxxx] stated that she only worked with KWIATKOWSKI on occasion as she was assigned to the cardiac suite and KWIATKOWSKI worked in Interventional Radiology IR. When asked her impression of KWIATKOWSKI Ms. [Xxxx] stated that she found him a little odd recalling that KWIATKOWSKI would sweat all the time and was erratic. Ms. [Xxxx] stated that when she asked KWIATKOWSKI if he was okay KWIATKOWSKI replied that he had just run up from downstairs.

[ ] Ms. [Xxxx] also stated that she believed KWIATKOWSKI was a very good IR tech.

*Exhibit I p. KWI-071862*.

A co-worker at the Veterans Administration Medical Center in Baltimore, Maryland, where Kwiatkowski worked in 2008 and where he was also implicated in the diversion of fentanyl, told investigators that he saw him extremely intoxicated at an Orioles game, that on another occasion Kwiatkowski was "already lit" within an hour after leaving work, and that Kwiatkowski admitted to the coworker that he drank too much; the same co-worker described Kwiatkowki as a smart, qualified IR technician and noted that an IR physician discussed retaining him on staff after his contract ended. *Exhibit I p. KWI-072463-72464.* Similarly, the manager of the cardiac catheterization unit at the Houston County [Georgia] Medical Center, where Kwiatkowski was hired in 2010, told investigators that he was "a competent lab technician who knew what he was doing in the lab," who often appeared to be drunk outside of work, and whom the manager observed "sweating bullets," perhaps sweating alcohol out of his system. *Exhibit I p. KWI-000244-246.*

In April of 2011 Kwiatkowski began work as a temporary contract employee at Exeter Hospital's Cardiac Catheterization Lab (CCL) *PSR ¶ 11.* His skills as an IR technician and his work ethic apparently impressed his supervisors, because Exeter Hospital hired him as a full-time employee in October of 2011. *Id.* He was terminated on July 19, 2012, *PSR ¶ 126,* the day he was arrested and a week after he attempted suicide

in a Holiday Inn in Marlborough, Massachusetts and was brought unconscious to the University of Massachusetts Medical Center (UMMC) in Worcester, *Exhibit I p. KWI-000014*; *PSR ¶ 19.*

A nurse anesthetist who worked with Kwiatkowski at the CCL at Exeter Hospital told investigators that he was "engaging, enthusiastic, and talkative" but"really sweaty" on occasion. *Exhibit I p.  KWI-000258-259.*  Another former coworker at the CCL remembered being on call with Kwiatkowski on an occasion when he was "totally on something," sweating, red-eyed, and shaking; he also recalled that Kwiatkowski sweated a lot and often used four by four squares of gauze to wipe his face. *Exhibit I p. KWI-000270.*  Advised that Kwiatkowski appeared to be on something and was not fit to care for patients, the director of the CCL met with Kwiatkowski, saw that his eyes appeared bloodshot - which he falsely attributed to the death of an aunt, and sent him home.  *PSR ¶ 17.* Other hospital employees observing Kwiatkowski on duty reported that his face was flushed, his eyes red, and his mouth surrounded by white foam, that he complained of abdominal pain and vomited often, that he frequently used the bathroom, and that he sweated profusely.  *Id.*  These are symptoms of Hepatitis C and Crohn's Disease and of withdrawal from fentanyl.  *Id.*  A phlebotomist who drew blood from Kwiatkowski reported that she saw fresh needle marks on his arm and opined that he was an intravenous drug user.  *Id.*  On July 19, 2013 Kwiatkowski admitted to investigators that he had a history of intravenous drug abuse and that at Exeter Hospital and at other

hospitals he injected himself with fentanyl syringes and  refilled them with saline, thereby

contaminating the syringes with Hepatitis-C, which he had contracted not later than 2010.

*PSR ¶ 19.*

  Prior to 2012 Kwiatkowski had received minimal treatment for substance abuse

*PSR ¶ 123.*  He underwent 17 days of detoxification in 2006 or 2007 with a plan for long-

term treatment thereafter but obtained a new job, relocated, and failed to follow through.

*Id.*

  The Pre-sentence Investigation Report outlines Kwiatkowski's mental and

emotional problems.  *PSR ¶ 121.*  He has a history of depression and a serious suicide

attempt shortly before his arrest last year.  Hospitalized last June, he was diagnosed with

Major DepressI've Disorder and Alcohol Abuse and upon discharge was prescribed

significant doses of psycho tropic medications, all of which he ingested eight days later,

when he was admitted and treated at the University of Massachusetts Medical Center

(UMMC) for poly substance overdose, resulting in acute respiratory failure, and alcohol

withdrawal.  Since his arrest and detention he has been diagnosed as suffering from Mood

Disorder, Psychotic Disorder, and Anxiety Disorder, as well as Opiate Dependence in

early full remission in a controlled setting.

  *Exhibit J* is a copy of a November 14, 2013 letter from Stuart Gitlow, MD, MPH,

MBA, FAPA. He practices in Rhode Island and is a board certified forensic psychiatrist

with a specialization in addiction.  His resume can be found at http://health.usnews.com/

doctors/stuart-gitlow-166163 (visited 11/19/13).  He reviewed Kwiatkowski's

voluminous medical records from June 24, 2012 until the present, as well as several

DVD's, including of the post-arrest interview of Kwiatkowski at UMMC.  He also spoke

to Linda Baillargeon, a clinical mental health coordinator who until recently regularly

counseled Kwiatkowski at the jail.  She opines that he is not a sociopath and describes

him as a poor self-advocate.

   Dr. Gitlow explains Addictive Disease, a medically recognized illness

His letter states:

> In the case of Mr. Kwiatowski, there can be no debating the presence of addictive
> disease, a disorder that is defined by impairment in behavioral control and
> diminished recognition of significant problems with one's behaviors. There can
> also be little debate that he was not directed to medical attention in the same
> manner as we would expect for any other chronic disease when discovered by
> peers, friends, and/or supervisors. Although one might attempt to interpret his
> actions as being that of hostility toward others, of lack of consideration toward
> others, and of those of an antisocial or sociopathic individual, the medical records
> do not support such an explanation. There are no significant examples of such
> tendencies or behaviors around any aspect of Mr. Kwiatowski's life save those
> involving obtaining the drug to which he was addicted. This implies that his
> behaviors were those of an individual who felt trapped and who felt that there was
> no escape other than the actions he took; these type of behaviors are a common
> result of addictive illness.
>
> This explanation is also consistent with an individual who had ongoing suicidal
> ideation as well as one recent act which nearly resulted in his death. This is the act
> of an individual who has such poor coping mechanisms as to be unable to deal
> with his overall situation. Poor coping skills play a key role in the development of
> addiction; these are addressed through AA and other self-help groups.
>
> As I note above, it is unclear as to whether Mr. Kwiatowski has the additional
> burden of psychiatric disease beyond the addictive disease. Given the suicidal
> tendencies and the consistent report of an auditory hallucination of music, and

given the family history of schizophrenia, there is likely at least some additional factor present that would contribute to his poor coping skills and overall inability to find a societally acceptable solution to his ongoing illness.

The scope and severity of the damage wrought by Kwiatkowski's conduct warrants significant punishment, but the Court should take into account the pernicious and escalating effects of the untreated addictive illness which he has suffered since he was a teenager in Michigan.   Dr. Gitlow's letter is instructive.

> An individual with addictive disease requires medical attention and life-long ongoing care as the disease is permanent and chronic. Interestingly, our society addresses this illness quite differently than it addresses others. For example, were we to find an employee at our business to have passed out in the corridor due to low blood sugar, we would immediately call for medical assistance. On the other hand, if an employee is found with slurred speech due to an overdose of drugs, we would often find that the employee is fired and removed from the premises by security without any referral to appropriate medical care. As a result, individuals with addictive illness, an illness in which denial is prominent, often go many years without receiving necessary care or treatment. Their illness worsens as time passes and their behaviors deteriorate such that what once would have been unacceptable is now tolerated as a means to the end, that being obtaining the drug deemed necessary for survival.

Kwiatkowski's addictive illness drove his craving for alcohol and controlled drugs but does not excuse him from being held accountable for the unintended but dreadful consequences of his conduct.  However, it is a mitigating circumstance which the Court should consider in imposing a sentence which is sufficient but not greater than necessary to implement the criteria in 18 U.S.C. §  3553(a).  See Cone v. Bell, 556 U.S. 449, 475 (2009) (Capital defendant's serious drug use did not exculpate him but was a mitigating factor for the jury to consider.)

### Conclusion

A sentence of thirty years in the custody of the Bureau of Prisons would comport with § 3553(a), which the First Circuit Court of Appeals has described as a "tapestry of factors, through which runs the thread of an overarching . . . parsimony principle" that "instructs district courts to impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing"  United States v. Vidal-Reyes, 562 F.3d 43, 48 (1st Cir. ), quoting United States v. Rodriguez 527 F.3d 221,227-28 (1st Cir.2008) (internal quotation marks & citation omitted).  Above the low end of the advisory guideline sentencing range, a sentence of thirty years would leave Kwiatkowski in custody for much of the rest of his life.  It would fairly balance the seriousness of his offense conduct, so harmful to so many people, against the mitigating circumstances of his own chronic physical illnesses, of his mental and emotional diagnoses, and of the addictive disease which  clouded his awareness of the risk to which he was exposing his patients, as well as himself.  It would promote respect for the law and provide just punishment.  It would deter other medical professionals whose own addictions might lead them to expose their vulnerable patients to undeserved risks of infection.   It would certainly protect the public from further crimes by Kwiatkowski, who will never again be able to work in the medical profession, and who will be  supervised after his release from the Bureau of Prisons.  It would enable him to participate in whatever treatment and programing might be available at the high security correctional facilities where he will likely be designated to serve much

19

if not all of his lengthy sentence.   The sentence sought herein would comport with the

sentences imposed in the <u>Beumel</u> and <u>Parker</u> cases, and so with 18 U.S.C. § 3553(a)(6),

which requires consideration of "the need to avoid unwarranted sentence disparities

among defendants with similar records who have been found guilty of similar conduct."

    For the above reasons the Court should impose a sentence which includes 360

months in the custody of the Bureau of Prisons.

                                 Respectfully submitted,
                                 David Kwiatkowski
                                 By His Attorneys,

Date: November 22, 2013                /s/ Jonathan R. Saxe
                                 Jonathan R. Saxe
                                 N.H. Bar No. 8226
                                 Assistant Federal Public Defender
                                 22 Bridge Street
                                 Concord, NH 03301
                                 Tel. (603) 226-7360
                                 E-mail: jonathan_saxe@fd.org

                                 /s/Bjorn Lange
                                 Bjorn Lange (NHBA # 1426)
                                 Assistant Federal Public Defender
                                 22 Bridge Street
                                 Concord, NH  03301
                                 (603) 226-7360
                                 E-mail: bjorn_Lange@fd.org

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that the above document was served on the following person on
November 22, 2013 and in the manner specified herein: electronically served through
ECF to AUSA John J. Farley and mailed to US Probation Officer Jodi Gauvin.

                                 /s/ Jonathan R. Saxe

Jonathan R. Saxe